[Cite as *In re K.C.*, 2013-Ohio-3403.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN THE MATTER OF:

    K.C.,

ADJUDICATED DEPENDENT CHILD.

[YANICA WRIGHT – APPELLANT].

CASE NO. 1-12-48

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2011 JG 28530

**Judgment Affirmed**

Date of Decision:   August 5, 2013

APPEARANCES:

    *F. Stephen Chamberlain* for Appellant/Mother

    *Mariah M. Cunningham* for Appellee, Allen Co. CSB

    *James A. Roeder*, Guardian Ad Litem

**WILLAMOWSKI, J.**

{¶1} Mother-appellant Yanica Wright ("Wright") brings this appeal from the judgments of the Court of Common Pleas of Allen County, Juvenile Division terminating her parental rights. For the reasons set forth below, the judgment is affirmed.

{¶2} This court initially notes that this case is a companion case to case nos. 1-12-49, 1-12-50, and 1-12-51. In February of 2001, K.C. was born to Wright and Daniel Wright.[1] In December of 2006, K.C. was adjudicated an abused child in case no. 2006-JG-23597. A sibling residing in the home at that time was found to be a dependent child. Wright served a jail term for her abuse of K.C. K.C. was then placed under protective supervision, which terminated by operation of law on November 25, 2008.

{¶3} On April 29, 2010, K.C. was placed under the protective supervision of Allen County Children Services ("the Agency"), along with his three siblings, G.W., T.W., and M.W. He was removed from the home under an emergency shelter care order on December 17, 2010. Temporary custody of K.C. was granted to the Agency at that time. On March 21, 2011, a new emergency shelter care order was signed and temporary custody of K.C. was continued with the Agency.[2]

---

[1] Daniel Wright, although personally served on March 28, 2011, elected to not participate in this case and never challenged the termination of his parental rights.
[2] The new order was done because the prior case was being terminated by the two year deadline set forth by statute.

The trial court granted the shelter care request due to Wright's failure to address K.C.'s need for counseling, the medical and dental needs of the children, the personal hygiene needs of her children and for denying the Agency access to her home. On March 22, 2011, the Agency filed a complaint alleging that K.C. was a dependent and neglected child. The Agency alleged in the complaint that Wright had failed to insure that K.C. received the required counseling, that Wright failed to comply with her own mental health service plan, and that Wright failed to maintain a clean and safe environment for K.C. Also on that day, K.C. was moved to a new foster home at the request of the foster parents due to his behavioral issues. A case plan was filed on March 24, 2011. The case plan required Wright to complete the following goals: 1) obtain a psychological assessment, 2) attend counseling consistently, 3) take random drug screens and test negative for all illicit drugs, 4) maintain the home in a clean and safe condition, 5) permit the Agency personnel to check on the home conditions at random, unannounced times, and 6) communicate with her caseworker. On March 25, 2011, the Guardian Ad Litem ("the GAL") filed a motion to suspend Wright's visitation with the children. This motion was based upon the fact that Wright became irrational and aggressive during a visitation to the point that the police had to be called to escort her from the building. The motion was granted by the trial court on April 1, 2011.

{¶4} An adjudicatory hearing on the March 22, 2011, complaint was held on May 12, 2011. The magistrate determined that the previous action had begun due to the poor home conditions including finding human feces in the heat registers. The magistrate noted that K.C. had severe food hoarding issues as well as behavioral issues that needed addressed. Wright had mental health needs that also needed to be addressed. Wright did not follow the case plan and obtain the necessary counseling for the two of them. Although Wright had been found in contempt of court for her failure to follow the case plan, she still chose not to comply and had to spend 30 days in jail for contempt of court. In addition, Wright's March 2011 drug screen was positive for marijuana. Wright had been terminated from mental health services for noncompliance. Due to Wright's failure to allow the Agency to view the home and other failure to comply with the case plan, the magistrate determined that K.C.'s environment was unsafe and found him to be a dependent child. The dispositional hearing was held on May 20, 2011. Temporary custody of K.C. was granted to the Agency. The trial court adopted the decisions of the magistrate concerning adjudication and disposition on July 5, 2011.

{¶5} On August 12, 2011, the Agency had to change K.C.'s foster home a second time due to the foster parents being unable to meet his needs. The Agency attempted to obtain Wright's consent to modify the case plan for K.C.'s new

placement. However, on August 17, 2011, as the caseworker pulled up to her home, Wright walked away before she could be addressed. On August 19, 2011, the caseworker attempted to contact Wright again, but no one answered the door. The caseworker left her card, but Wright did not contact her. Thus, the Agency was forced to seek court approval of the change to K.C.'s placement.

{¶6} Wright, on August 18, 2011, filed a motion for in-home visitation with K.C. and his siblings. The Agency opposed the motion on the grounds that Wright was not complying with the case plan. A hearing on the motion for visitation and approval of a modified case plan was held on October 13, 2011. The magistrate noted that Wright had a positive drug test in August of 2011, but a negative one in September of 2011. The magistrate also noted that K.C.'s behavior had improved, but was still an issue since at that time, K.C. had been suspended from school for punching a teacher. Based upon Wright's unwillingness to follow the case plan and address the issues, the magistrate denied her motion for in-home visitations. The magistrate also approved the modified case plan. The trial court adopted the magistrate's decision on November 9, 2011.

{¶7} On October 6, 2011, the Agency filed a motion requesting that Wright be held in contempt for not following the case plan by 1) failing to work with the family aid, 2) failing to allow the Agency access to all rooms in her home for inspection, 3) failing to have a source of income, 4) failing to take random drug

screens when requested and failing the one she did take, and 5) failing to follow the recommendations of her psychologist or attend counseling. A show cause hearing was scheduled for February 29, 2012, regarding Wright's failure to comply with the court ordered case plan. At the hearing, Wright admitted violating the case plan by refusing a drug test and by testing positive. The magistrate decided that Wright was in contempt of court. The trial court adopted the magistrate's decision on April 16, 2012.

{¶8} On December 9, 2011, the GAL filed a motion to suspend visitation. The motion was based upon K.C.'s negative reactions prior to and following his visit with Wright on Tuesday. The GAL indicated in his affidavit that K.C.'s worst days for behavior were Monday, Tuesday, and Wednesday. He indicated that K.C. would even wet the bed on those days and that K.C. was very concerned that his mother would learn that he had been in trouble at school. In addition, K.C. had been suspended from school for attempting to choke a teacher. On December 8, 2011, K.C. had been admitted to St. Rita's Medical Center for making suicidal statements. During the visits, Wright usually did not interact with K.C. The trial court granted a temporary order suspending visitation *ex parte* on December 14, 2011, with a full hearing scheduled for February 29, 2012. At the hearing, K.C.'s teacher testified that since the visits were suspended, K.C.'s behavior had dramatically improved. Previously K.C. had been bullying students, acting out,

and refused to do his school work. His behavior had been violent at times. Since the visits ceased, he had been completing his school work and had been helping other students. The family aide testified that Wright usually ignored K.C. at the visits and any interaction was not positive. K.C.'s only request upon learning that the visits were ceased was if the court would give him permission to get his hair cut now.[3] The magistrate's decision recommended suspending the visitation with K.C. and further stated that K.C. should be allowed to get his hair cut, but left that choice up to the foster parents. The trial court adopted the magistrate's decision on April 16, 2012.

{¶9} On February 13, 2012, the Agency filed a Motion for Permanent Custody of K.C. The motion alleged that Wright had failed to comply with the case plan to substantially remedy the conditions of the home and has repeatedly withheld medical treatment and food from K.C. The parties stipulated to the report of Dr. Thomas L. Hustak ("Hustak"), a forensic psychologist, regarding the psychological evaluation of Wright. The evaluation was completed in April of 2011. It was filed with the court on June 26, 2012. Hustak's report indicated that Wright claimed that it was K.C.'s behavior that caused the Agency to become involved with her family. She claims that the landlord called the Agency because K.C. would hit his siblings, urinated on the carpets, left bowel movements in the

---

[3] Wright testified that she does not allow her children to get their hair cut because she does not believe in it.

-7-

vents of the house, and refused to brush his teeth. Report, 4. Wright minimized her responsibility for the Agency's involvement by claiming that her caseworkers "had an attitude against me." Report, 5. Wright's idea for discipline involved physically striking K.C. *Id*. The mental status examination indicated that Wright has some difficulties with concentration. Report, 6. Her composite IQ was determined to be 72, which was below average. Report, 7. Her verbal score of 68 was "quite low, placing her in the 'lower extreme' category suggesting that 98% of the population scores higher than [Wright] and she has the verbal age of a 10 year old." *Id*. Hustak noted the following regarding Wright's adaptive behavior.

> **The results of this assessment showed that [Wright's] independent functioning in most areas was adequate. Exceptions included strong underarm odor and wearing clothes that were not properly cleaned. She apparently is appropriately mobile and has a telephone but she has no independent means of transportation. Other areas of independent functioning are adequate.**

> **[Wright's] physical development apparently shows no major difficulties. Her economic activity shows that she apparently does not use banking facilities but purchases her own clothing. Her speech sometimes exhibits halting and irregular interruptions but otherwise is reasonably developed. Social language development is lacking. She doesn't talk sensibly when interacting with CSB workers and they find it difficult to reason with her. Her self-direction is also lacking in that she needs encouragement to complete tasks, has little ambition, and her movement when observed by [the Agency] workers seems to be sluggish and slow. She becomes easily discouraged, needs encouragement to complete things that are assigned to her, and unfortunately does not always maintain self-control over her behavior. She doesn't respond to others in a socially acceptable**

**manner and demonstrates significant impairment in the area of social behaviors. Specifically, when interacting with CSB she has used threatening gestures, has thrown objects, exaggerates stories of interaction with CSB workers, appears to manipulate others to get them in trouble, and has difficulties following instructions.**

**When she does not get her way, she becomes upset, does not pay attention to instructions, hesitates for long periods before doing the tasks, and frequently does the opposite of what is requested. She resents those in authority, is disruptive, and tends to repeat things when asked questions.**

Report 8-9.

{¶10} Hustak administered the Minnesota Multiphasic Personality Inventory – 2 ("MMPI-2") to Wright. The results of the MMPI-2 indicated that Wright has problems with anyone who has power over her. Report, 10. Her response to relationships is to become aloof and cold in an attempt to advance herself at the expense of others. Report, 11. This profile on the MMPI-2 is indicative of one with a severe personality disorder. *Id*. Wright's disorder has led to paranoid thinking. *Id*. People with profiles like Wright are likely to have angry outbursts that will be blamed on others. *Id*. Wright also is suspicious of other's motives and believes that she would be fine if people were not plotting against her. Report, 12. Wright's profile also indicated a borderline score on the schizophrenia scale. *Id*. Hustak determined that the prognosis for Wright is poor because from her perspective, "everything is caused by someone else other than the things that she herself does or fails to do." *Id*. Although there was no

indication of psychotic or antisocial behavior, Wright's unusual thinking does interfere with her social interactions. Report, 13.

**{¶11}** Due to the indications of personality disorder issues, Hustak administered the Millon Clinical Multiaxial Inventory – III ("MCMI-III") to assess Wright's functioning. Report, 14. The MCMI-III indicated that Wright has traits of a compulsive personality disorder. *Id.* This is exhibited through perfectionism in her decision making and completion of tasks. However, due to her limited intellectual functioning, she is not capable of achieving perfectionism in her choices. Report, 15. "[I]n some ways, one could conclude that she is not very good at embracing her desire to be compulsive." *Id.* Wright views the world as rigid and becomes upset by her own indecisiveness. *Id.* To repress her thoughts of inadequacy, Wright creates positive thoughts of herself even if they are contradicted by the evidence. *Id.* The positive aspects of the MCMI-III were that there was nothing to suggest that Wright suffered from anxiety, alcohol dependence, post-traumatic stress, borderline thinking, schizophrenia, depression, or a delusional disorder. Report, 16.

**{¶12}** In his conclusion, Hustak determined that a likely diagnosis for Wright would be "Personality Disorder NOS which takes into account the fact that she possesses traits and symptoms of the three personality types noted above in various combinations to account for her problematic behavior." Report, 17.

> **Unfortunately, this personality combination makes it very difficult to have [Wright] address problems when she is convinced that she does not have those problems and/or that the problems she sustains are caused by other people. When questioned about how these situations transpired with her children in regard to the concerns expressed by [the Agency], [Wright's] explanations were quite poor and offered little substance for understanding why things have gotten so out of control. \* \* \***

> **\* \* \***

> **While it is true that no scientific predictions can be made with any degree of absolute certainty about the future, one does need to evaluate risks for problems as they arise. At the time of her evaluation, [Wright] had significant limitations that would appear to place her children at risk. If she could follow all of the guidelines listed above, it would still be difficult to conclude that all of those risks would be eliminated unless clear evidence could be presented to professionals that a systematic and safe treatment plan with supervision, cleanliness, and safety could be adequately provided by [Wright] in her home environment. Frankly, the probability of this happening would be considered fairly low because her cognitive limitations are static (not changeable) whereas the personality configurations may be more dynamic (subject to change depending upon her willingness to do so).**

Report, 17, 20.

{¶13} On July 24, 2012, the parties stipulated that a transcript of Jennifer Cunningham's ("Cunningham") testimony from the February 29, 2012, hearing would be admitted without objection. Cunningham had been K.C.'s teacher since January 2011, at the alternative school he attended. She testified that when K.C. first was placed in the school after poor behavior at Lima City Schools, he would

just leave the classroom or the building. Ex. 7, 2. He would also hit, punch, and/or kick people. *Id*. at 2. Eventually K.C. settled into the school and his behavior improved. *Id*. at 3. Before visits ceased in December of 2011, the faculty had a difficult time getting K.C. to even enter the school building without arguments. *Id*. at 5. K.C. would yell at the teachers, run around the building, push people, and/or kick people. *Id*. This behavior was repeated on Tuesday and Wednesday. *Id*. at 5-6. By Thursday, K.C. had settled into a normal routine. *Id*. 6. K.C. told Cunningham on approximately three occasions that Wright had either not appeared for visits or that she had said something at the visit to make him angry. *Id*. At the end of December, K.C. was suspended for 10 days for assaulting a staff member and a police officer. *Id*. at 7. Since his return to school in January, K.C.'s behavior was dramatically different, with no discipline for approximately two months. *Id*. Cunningham described K.C. as being sociable, reasonable and helpful since he returned to school in January of 2012. *Id.* at 8. Cunningham also testified that K.C. told her he was angry that Wright would ignore him at the visits. *Id*. at 9. During the timeframe that K.C. was having visits with Wright, he would not do his school work and he would attempt to pick fights with the other students. *Id*. at 10.

{¶14} The GAL filed his report on July 24, 2012. The GAL noted that he had reviewed the Agency's file on multiple occasions, reviewed the court records,

reviewed Wright's Facebook page, reviewed Wright's psychological evaluation, spoken with the care providers and had multiple visits with K.C. GAL Report, 1-2. The GAL noted that although K.C. continued to have some behavioral issues, he has improved. *Id.* at 2. He noted that K.C. does not like changes to his routine. *Id.* Once the visits with Wright were terminated, K.C.'s behavior showed marked improvement. *Id.* The GAL indicated that he had spoken to K.C. and that the child indicated that he did not want to return to Wright. *Id.* Instead, K.C. indicated that he wished to remain with his current foster parent. *Id.* Thus, the GAL recommended that Wright's parental rights be terminated and permanent custody be granted to the Agency. *Id.* at 4.

{¶15} On July 31, 2012, the parties stipulated to the admission of the testimony of Ashley Mertz ("Mertz") from the February 29, 2012, hearing. Mertz was the foster mother of K.C.'s siblings. She testified that she observed K.C. at the visits between the siblings. Ex. 8, 6. She also testified that at the visits K.C. speaks with her and is really pleasant. *Id.* at 7. She has not observed any inappropriate behavior between the children. *Id.*

{¶16} The hearing on the Motion for Permanent Custody was held from August 1-3, 2012. At the beginning of the hearing, the parties stipulated to the admission of Exhibit 2, the deposition of Erica Croft ("Croft") which was completed on June 28, 2012. Croft was K.C.'s kindergarten teacher. At the

beginning of kindergarten, K.C. was developmentally delayed in his speech and fine motor skills. *Ex.* 2, 8. The school tried to enroll K.C. in speech and occupational therapy to address those issues, but Wright refused. *Id*. at 9. Wright refused to sign an Individualized Education Plan ("IEP") so that K.C. could receive assistance. *Id*. at 10. Wright considered the services to be a "special ed" class and refused to allow K.C. to be placed in one. *Id*. at 12. Croft attempted numerous times to explain to Wright that this was not a "special ed" class, but just support services. *Id*. Wright did not change her position. *Id*. As a result, K.C. did not progress well academically. *Id*. at 13. In addition, he had behavioral issues that were not addressed by Wright.

**Q. Can you tell me about some of those behavioral issues?**

**A. He did not get along well with the other kids, didn't have any friends in the class, he would be physical with them, he would be – he would yell at them kind of thing. One time, he took off all of his clothes and ran out of the building, just kind of bizarre behaviors. He ate a urinal cake. I mean, just very odd behaviors. The other children found him to be very odd.**

**Q. Did you discuss these behavioral concerns with Ms. Wright?**

**A. Yes.**

**Q. And what was her response when you would discuss the concerns with her?**

**A. A lot of the times she would blame us, and tell us we didn't know what she was – we were talking about, and we didn't understand her child. She would write long, rambling**

**letters, accusing us of picking on [K.C.], or not understanding her and what her life is, so \* \* \*.**

**Q. Was she helpful to you in letting [K.C.] know these behaviors were not appropriate?**

**A. No. No.**

*Id.* at 13-14. Wright also was not good about watching K.C.'s personal hygiene.

**Q. Was there any concern with [K.C.'s] hygiene?**

**A. Yes.**

**Q. In what way?**

**A. The other children and I noticed that [K.C.] did have a smell on him all the time. He would either smell of urine or just – it would be just like a dirty, dirty smell. And our school nurse at the time, we had a shower, so she would sometimes clean him up and get him in a clean change of clothes when it just got unbearable in the room, where the other kids couldn't function because they were, I can't stand to sit next to him. And so that just made it even more difficult for him to make friends and to become a part of the class. And his hair was also, a lot of the times it would be this big poof on the top of his head that would just have all kinds of things in it. And –**

**Q. What types of things?**

**A. Well, it would – he had – they kind of looked like pieces of foam, a lot of the time was in there, and then there would be food in there, and it was just kind of – just part of it would be poofy, part of it would be matted. He just had a very odd appearance.**

**\* \* \***

**Q. Did you have discussions with Ms. Wright about the concerns with the cleanliness of –**

**A.   Yes.**

**Q.   [K.C.'s] clothes?  And what did she tell you?**

**A.   She told us that it was none of our business.**

**Q.   Did you have discussions with her about the concern of the odor that he had?**

**A.   Yes.**

**Q.  And what did she tell you?**

**A.   It was none of our business.**

**Q.  * * * With respect to those conversations, was there improvement in his hygiene or clothing after you had them.**

**A.   No.  It think it was almost in defiance, it got worse, that she let him – because sometimes it would be braided, and then she'd really let the hair go, after we tried to discuss it with her.**

*Id.* at 15-19.

{¶17} Croft testified that when they had meetings with Wright and her social worker, she was polite to her social worker, but hostile to the school faculty. *Id.* at 24.  While in her class, K.C. would eat everything he was given and would try to take additional food from the cafeteria.  *Id.* at 26.  K.C. would even attempt to take half-eaten food from the trash can.  *Id.*  Concerned that he was hungry and there was a lack of food in the home, the school sent a backpack of food home with him.  *Id.*  In response, Wright sent a note telling them not to feed him or send a backpack of food with him again, that she did not need help.  *Id.*  Throughout the

school year, she saw no improvement in K.C.'s performance or in Wright's willingness to work with K.C. *Id.* at 31.

{¶18} The first live witness was Judith Lester ("Lester"), who is a licensed social worker. Lester started working with K.C. and Wright in January of 2007. Tr. 14. K.C. was referred to help improve his behavior and also to help Wright learn more positive parenting practices. Tr. 16. K.C. at the time was behaving atypical for his age. Tr. 19. He would often get out of his seat and was known to shout out inappropriate sexual statements in his kindergarten class. Tr. 19. Lester testified that K.C. was frequently teased due to his personal hygiene. Tr. 19. She observed K.C. in the classroom and was part of the intervention team developed by the school to help K.C. Tr. 19-20. Lester testified that she discussed K.C.'s lack of cleanliness during home visits with Wright. Tr. 20. Wright denied that there was a problem and insisted that K.C. and his clothes were always clean despite all the evidence to the contrary. Tr. 20. Despite numerous meetings with Wright, she was frequently angry and out of control, so no real progress was made. Tr. 23. Lester only worked with K.C. and Wright for two months because Wright was not cooperative. Tr. 25. Out of the ten home visits scheduled, Wright only was home and willing to work with Lester for five of the visits. Tr. 25. Wright did not wish to participate in services and only wanted the counselors to work with K.C. Tr. 25. Lester provided Wright with instruction on how to use

anger management techniques for both Wright and K.C., but Wright just insisted they did not work. Tr. 28-29. Rather than continuing to work on the anger issues, Wright just quit trying. Tr. 30.

{¶19} Lester also testified as to the condition of the home. On January 24, 2007, Lester visited the home and smelled the odor of something rotting throughout the home. Tr. 30. On February 8, 2007, there was a new puppy in the home and no one had cleaned up the dog feces from the living room floor. Tr. 31. Wright did then try to pick up some of the feces while Lester was at the home. Tr. 31. The smell was so strong that it was noticeable outside of the home. Tr. 42.

{¶20} Kelly Huffman ("Huffman") testified from her work with the family as a therapist. Huffman has worked with K.C. for approximately three years through her employment with SAFY Behavioral Health. Tr. 46. Before that she worked with him through her employment at Family Resource Center and through the school system. Tr. 46. She worked with Wright while doing family counseling for K.C. Tr. 47. She has counseled him while he was in Wright's custody and after he was placed in the custody of the Agency. Tr. 49-50. Huffman testified that K.C.'s initial treatment plan addressed his aggressive behaviors in the school and in the home as well as his food issues. Tr. 51. To be successful, Huffman needed Wright to participate in the counseling so that the

behavioral issues are addressed consistently. Tr. 51. Huffman testified that Wright was very angry and frustrated with K.C. and his behavior. Tr. 52.

{¶21} Huffman testified that K.C.'s issues with stealing and hoarding food were troubling. Tr. 54. These types of issues usually arise when there has been neglect or in situations where food is frequently lacking. Tr. 55. Eventually, K.C. told Huffman in sessions that Wright would discipline him by locking him in his room and not letting him leave for any reason, including to use the restroom or to have food. Tr. 55. For treatment, Huffman recommended to Wright that K.C. have a "food box" available at all times with healthy snacks so that he would not worry about having no food. Tr. 56. Wright did not feel it would work, so she did not try it. Tr. 56.

{¶22} Huffman testified that the interactions between Wright and K.C. at the sessions indicated some distance in their relationship. Tr. 56. Wright was frequently angry and frustrated and K.C. was fairly quiet around his mother. Tr. 56. Some techniques were tried that did have a positive effect and the relationship improved while they attended over summer break. Tr. 57. However, once school began again, Wright became frustrated and the relationship deteriorated. Tr. 58.

{¶23} Over time, Huffman has been able to modify K.C.'s treatment plan. Tr. 58. They are still working on his defiant and aggressive behavior, but it is improving. Tr. 58. Once K.C. entered into foster care, he was able to resolve his

food issues, so that goal has been completed. Tr. 59. While he resided with Wright, there was no progress on the food issues. Tr. 59.

{¶24} Huffman tried to teach Wright how to model anger management techniques so that K.C. would learn them. Tr. 61. Wright did learn some skills and demonstrated that she could use them. Tr. 62. However, the higher Wright's frustration level, the less likely she was to use the techniques. Tr. 62. Her ability to use the anger management techniques was inconsistent over time and she eventually reverted back to her old methods of handling stress and frustration. Tr. 63.

{¶25} Over the years, K.C. has made improvements. Tr. 63. He still has outbursts, but he is able to self-calm. Tr. 63. He is no longer destructive and no longer runs away when he is angry. Tr. 64. He has made the majority of his improvement in the six or seven months prior to the hearing. Tr. 65. Huffman testified that she would like to see K.C. mainstreamed back into regular classes rather than continuing at the alternative school, but that doing so will require him to continue with therapy to address the additional stress such a change will bring. Tr. 66. Huffman testified that K.C. has a great deal of anger towards his mother concerning how she has treated him. Tr. 67. When visits were first stopped, he was fearful that something had happened to her. Tr. 67. After several months, K.C. told Huffman that he does not want to return to Wright, that he wishes to

remain with his foster parent and to be adopted. Tr. 67. K.C. would like a relationship with his mother, but not until he is an adult. Tr. 68. In the six months prior to the hearing, which was after visitations with Wright were suspended, K.C.'s behavior had stabilized. Tr. 88. Huffman testified that it is very important that K.C.'s caretaker actively participate in the counseling for the counseling to have an impact. Tr. 68. Wright's participation with counseling was inconsistent and depended on her frustration levels and was not good for K.C. Tr. 69.

{¶26} Huffman testified that over the years she had been working with K.C., his hygiene was an ongoing issue that kept reoccurring. Tr. 71-74. Huffman spoke with Wright about her role in teaching K.C. good hygiene. Tr. 74. There was some improvement, but the issues of poor hygiene always returned. Tr. 74. Medical tests were completed to rule out a medical condition that might be causing the lack of urinary control, but K.C. was determined to be generally healthy. Tr. 75. After K.C. was removed from the home and placed in foster care, his hygiene greatly improved. Tr. 77. He now showers and brushes his teeth on a regular basis and no longer comes to appointments smelling of urine. Tr. 77. K.C. is starting to take pride in his appearance which is helping. Tr. 77.

{¶27} Huffman also provided counseling services to Wright at the request of the Agency. Tr. 77-78. Her goal was to improve her methods of communicating with people and to learn to manage her anger in an appropriate

manner. Tr. 78. Wright actively participated in counseling from April to October of 2010. Tr. 79. Then Wright had to terminate services due to losing her medical insurance. Tr. 79. Once the insurance issues were resolved, Wright returned to counseling from January 11, 2011 until services were terminated in September of 2011. Tr. 80. The counseling was terminated because Wright missed too many appointments and Huffman referred her to Coleman Behavioral Health. Tr. 81. Huffman testified that Wright did make progress in learning to control her anger and implementing the skills she had been taught. Tr. 83. However, Wright has a harder time implementing the skills when there are multiple stressors on her. Tr. 84. The relationship between Huffman and Wright was destroyed when Huffman reported to the Agency that K.C. had missed a counseling appointment. Tr. 86.

{¶28} When questioned about Wright having custody of K.C., Huffman stated that she had concerns. Tr. 89.

> **A.  I had concern about [K.C.'s] behavior and the amount of anger and frustration that occurred with his mom and him.**
>
> **Q.  Why is that?**
>
> **A.  Because she was very angry with him a great deal of the time, very frustrated with his behavior, very frustrated with the fact that he wasn't making progress. It seemed the more prolonged that happened, the more the anger increased; and it kind of over, overtook their relationship in a sense. Their interactions, at least I only had them in my office, were predominantly negative. So, yes, that's of concern for both of them**

**Q.   You stated that since [K.C.] has been removed from the custody of his mother, he's told you certain things that happened while he was in her care, correct?**

**A.   Yes.**

**Q.   And did those concern you with respect to him being in her care?**

**A.   Yes, it would be of concern unless she modified her parenting and changed the way she disciplined or corrected him.**

**Q.   Through the experience that you had with her, did you see her able to consistently make those changes that you were suggesting to her?**

**A.   Not consistently.  I did see changes, I did see improvements, I did see positive interaction between she (sic) and [K.C.].  So, I mean, I've seen it, it just didn't maintain.**

**Q.   Do you believe that there are any further services that SAFY could have offered to Ms. Wright to participate and to reduce the actions that lead to your concern for [K.C.] being with her?**

**A.   We had offered pretty much every service that we have available to them.  We had also offered mother respite services to kind of decrease some of the stress and tension when it was becoming overwhelming just to give them a break, give her a break so that she can concentrate on some of the other kids, give him a break, kind of give everybody a little bit of relief.**

**Mother was very hesitant, which I can understand as far as – but we had talked about you'll meet the respite providers, you, you know, can be involved in interviewing them, talking with them.  She was very hesitant to take on respite.  She said that [K.C.] didn't really want to go and that he was afraid to go to respite, and so respite services never happened.  Whether or not that may have helped to reduce some of the stress and tension between the two of them and at home, I don't know.  But that's**

**the only other service that we could have possibly offered that may have assisted.**

Tr. 89-92.

{¶29} The next witness presented by the Agency was Kelly Smith ("Smith"), who was the family aide assigned to Wright by the Agency. Smith's job is to help the parents accomplish their case plan goals. Tr. 115. Smith worked with Wright from December 2006 until June 2007. Tr. 117. Smith attempted to help Wright secure employment, learn parenting skills, and follow through with counseling for K.C. and Wright. Tr. 119. Wright did complete the Parent Project Junior Class. Tr. 122. During her time with the family, Smith was concerned about Wright's interactions with K.C. because she never saw any affection between them. Tr. 123. Although Wright would apply the parenting techniques she was taught in the short-term, she did not use them over the long-term. Tr. 126.

{¶30} Smith would meet with Wright sometimes in the home, but usually Wright was short tempered and uncooperative at those times. Tr. 126. K.C. would usually be in his bedroom and when Smith would ask why, Wright would tell her he was in trouble and it was none of Smith's business. Tr. 126. Wright did not think she needed assistance with her parenting. Tr. 127.

{¶31} Smith testified that Wright had court ordered counseling sessions for K.C. and Wright. Tr. 130. Smith helped Wright to calendar her appointments. Tr. 130. In addition, Smith offered to provide transportation to and from the

counseling appointments. Tr. 130. Wright still continued to be inconsistent in her attendance. Tr. 130. When questioned about counseling, Wright frequently lied about scheduling appointments, having rides, and even claiming to have attended sessions that she did not attend. Tr. 131.

{¶32} Smith also attempted to help Wright seek employment. Tr. 131. Smith gave Wright tips on job searching, provided transportation to potential employment places, helped Wright complete applications and even provided a voucher for Wright to purchase clothes for an interview. Tr. 132. After a month, Wright declined the services claiming that she could get a job, but it was not her priority at that time. Tr. 132. The family was allegedly being supported by Wright's Met check of less than $100 a month and the money Wright made by selling candy bars. Tr. 133. At Christmas time, Smith offered to help Wright provide Christmas for the children. Tr. 134. Wright agreed to fill out the application for her youngest child, but did not wish to add K.C.'s name because she did not want him to have anything. Tr. 135. Wright claimed that he did not deserve anything, though she eventually agreed that he could have some educational toys.[4] Tr. 135. When the gifts were presented to the family, Wright was angry that K.C. was given toys. Tr. 135. Wright then told Smith that she had put all the toys in the basement because K.C. did not deserve them. Tr. 136.

---

[4] This court notes that at that time, K.C. would have been five years old.

{¶33} Smith testified that she frequently was in the home. Tr. 136. She was concerned about the conditions in the home. Tr. 136.

> **The odor in the home was very overwhelming. It was a strong urine and feces smell. The carpet, you couldn't even tell like what, the carpet was so matted down with stains and different things on the carpet. There was a bad problem with cockroaches. There was a little bit of clutter, the few times that I saw the kitchen, dirty dishes, clutter, garbage overflowing.**

Tr. 136-37. When Smith addressed the issue of the home with Wright, she was told it was none of her business. Tr. 137. Eventually, Wright moved from the home on Hope Street to a different one on Catalpa. Tr. 139. When Wright first moved into the new home, it was nice. Tr. 141. The Agency provided Wright with new mattresses for K.C. to replace the soiled one. Tr. 141. They also provided her with a refrigerator, stove, table, pots, and pans. Tr. 141. K.C.'s bedroom was nicely set up with the new mattresses and bedding. Tr. 142. The house on Catalpa remained in good condition for less than a month. Tr. 141. Within that time, the cockroaches and the odor returned. Tr. 142. After that, Wright was uncooperative at the home visits and would not allow Smith to look at the other rooms, including the children's bedrooms. Tr. 142. Eventually, Wright would deny Smith access to the home and would not even let her see K.C. Tr. 143. This behavior continued despite Smith's reminder to Wright that she was there due to a court order. Tr. 143.

**{¶34}** Smith testified that Wright could be cooperative and open. Tr. 143. However, any time Smith tried to approach her about a concern, Wright would shut down because she did not want to hear about it. Tr. 144. The Agency attempted to help with the housing issue by providing cleaning supplies. Tr. 145. Smith personally volunteered to help her clean the home. Tr. 145. Smith made chore lists to help Wright learn what needed to be done and gave Wright tips on how to keep the house clean. Tr. 145. Wright was not receptive and declined the offer of help with the cleaning. Tr. 146. At times, the house would be cleaner, but the condition would not be maintained. Tr. 146.

**{¶35}** As to the personal hygiene of K.C., Wright was just as inconsistent. Tr. 147. K.C.'s clothing was frequently dirty and smelled of urine and feces. Tr. 147. To help with the situation, the Agency provided Wright with a washer and dryer so that she could clean K.C.'s clothing. Tr. 147. That did not help as Wright still did not wash his clothing. Tr. 148. Smith volunteered to come to the house before school and help make sure K.C. was clean and dressed appropriately. Tr. 149. Wright allowed her to do so for four days, but was not happy and constantly yelled at K.C. from where she sat on the couch while Smith was there helping him. Tr. 150-51. On one occasion Wright helped by grabbing a dirty rag from the floor and using it to wipe his face. Tr. 151. After four days, Wright made it clear she did not want Smith there anymore. Tr. 152. For those four days,

there were no problems with K.C.'s appearance at school. Tr. 152. When Smith was no longer helping, the reports concerning his appearance and hygiene returned. Tr. 153.

{¶36} Eventually, Smith's services as a family aide to Wright were terminated for noncompliance by Wright. Tr. 154. Smith testified that although she tried on numerous occasions to speak with Wright concerning the issues, Wright did not recognize there were problems. Tr. 154. Smith further testified that in her opinion, there was nothing more the Agency could have done to help Wright due to Wright's lack of compliance. Tr. 155.

{¶37} Christin Winter ("Winter") testified that she is a family aide for the Agency who had been working with Wright from May 2009 until July 2012. Tr. 168. At the beginning, Wright was living in a home on Woodward Avenue. Tr. 197. Winter was originally assigned to work with Wright on maintaining a safe and appropriate home. Tr. 168. Over time, her goals expanded to include helping Wright to find employment and teaching her about child developmental levels so that Wright's expectations would be reasonable. Tr. 170. At the beginning, Wright was cooperative with her, but she became less so as time passed. Tr. 170-71. Winter testified that if she gave Wright a task, such as cleaning out the refrigerator before the next visit, Wright would agree to do it, but never did. Tr. 171. Eventually, Winter had to bring another party with her on home visits for

safety reasons. Tr. 171. When the caseworker would go with Winter, Wright was not receptive to anything the caseworker said. Tr. 174. Winter testified that Wright would tell the caseworker she was not allowed to speak, would ask her to leave, or would insist that the caseworker only speak to Winter and that Winter relay the information. Tr. 174. Wright would frequently ask Winter questions that only the caseworker could answer, but would refuse to speak to the caseworker when told that Wright would have to call her. Tr. 175. Wright even refused to give them a contact phone number. Tr. 177. The few times Winter would be given a number, Wright would tell her not to give it to the caseworker. Tr. 177.

{¶38} Winter was assigned to work with Wright on parenting techniques because of the Agency's concerns regarding appropriate discipline techniques. Tr. 178. Concerns were raised because on one occasion, Winter arrived at a visit to see a child in timeout and the children would remain there for the entire 45 minute visit. Tr. 178. When Winter mentioned to Wright that it was excessive, Wright responded that the child had been bad and would sit there until she told them they could get up. Tr. 179. Although Wright had taken several parenting classes, there has been no improvement in her parenting skills. Tr. 180. Wright could repeat what she was taught, but did not implement it in the home. Tr. 181. On most visits, Wright would either have K.C. in or would immediately send K.C. to his bedroom for the entire visit. Tr. 181. The result is that majority of the visits

occurred without Winter ever seeing the children, even if the visits lasted for an hour and a half. Tr. 181-82. When questioned, Wright would say K.C. had been bad and that she had sent him to his room. Tr. 182.

{¶39} Winter had concerns regarding the conditions in the home. Tr. 182. There was spoiled, moldy food in the refrigerator, cockroaches throughout the home, and cords lying all around the floor presenting safety hazards. Tr. 182, 200. When Winter raised these issues with Wright, she would either roll her eyes and ignore Winter, or would say she would fix it, but never did. Tr. 183, 200. On several occasions, Winter found human feces in K.C. and G.W.'s bedroom. Tr. 197. In 2010, Wright started becoming less cooperative. Tr. 183. She eventually refused to let Winter or the caseworker into the house for an unannounced visit. Tr. 184, 200. If they went for an announced visit, they were asked to leave when they tried to address an issue that Wright did not want to discuss. Tr. 184. Eventually, Wright moved to a different home on Kenilworth. Tr. 201. Wright had refused to give them the new address, but Wright's mother gave it to the caseworker. Tr. 201. As before, the initial visits showed the new home to be in good order, but conditions deteriorated. Tr. 202. On the day K.C. was removed from the home, the conditions were deplorable. Tr. 205.

> **There were – there was food laying around, there were food wrappers, papers, there were several cockroaches that were crawling over my shoes and my supervisor's shoes while we were**

> **standing in there. There was an odor about the home, garbage, urine.**

Tr. 205.

**{¶40}** Winter continued to work with Wright after K.C. was removed from her custody. Tr. 184. During the visits, Wright did not interact with K.C. very often. Tr. 190. Winter attempted to teach Wright how to talk to K.C. and pay attention to him. Tr. 191. Wright would try to do so, but then one of the younger children would want attention and she would go back to them. Tr. 191. K.C. spent most of the visits sitting by himself, sleeping, playing with the younger children, or talking to Winter. Tr. 193. Visits were stopped by court order after safety concerns for the staff due to Wright's behavior were raised. Tr. 195. Winter testified that she has seen some of the sibling visits. Tr. 195. Without Wright present, the children all interact more and the atmosphere was more positive. Tr. 195-96.

**{¶41}** When questioned about her work with Wright, Winter testified that she usually only works with a family for up to a year rather than the three years she had worked with Wright. Tr. 213. Winter testified that for the majority of the three years, Wright had not been cooperative. Tr. 213.

> **A. [Wright] would not allow me to do unannounced visits, and that was part of the agreement that we had from the very beginning; she would not take the suggestions that I had given her; she wouldn't take things seriously when I would tell her**

**that she needed to do something or needed to take care of something.**

**Q.   Do you believe that prior to the children being removed from Ms. Wright's custody, there's anything further the agency could have done to maintain them in her home?**

**A.   No.**

**Q.   And why not?**

**A.   She had been offered everything that we could possibly offer her:   Transportation, help parenting, connecting with different resources in the community.   There was nothing else that we could have offered her at that time.**

**Q.   Did you, as a family aide, have concern about the children remaining in her care?**

**A.   Yes.**

**Q.   And why is that?**

**A.   The ongoing concerns with home conditions, the way that she addressed the school when they would have concerns, her interaction with agency workers.**

Tr. 214.  Counsel for the Agency also asked Winter if there was anything more the

Agency could do to assist in reunification.

**A. No, she was given all the same opportunities that she had before the children were removed.  We tried some of the same services again.**

**Q.   When you say you tried some of the same services again, what –**

**A.   Counseling, offered her transportation wherever she needed to go for case plan services.  I stayed on as the family**

**aide, even though everything that I was going to address had already been addressed at some point.**

**Q. And did you again address those issues?**

**A. I did.**

**Q. Did you see an improvement?**

**A. No.**

Tr. 215-16.

{¶42} The next witness for the Agency was the GAL. He testified that he had been working with the family from 2006. Tr. 240. During his tenure, Wright had lived in multiple homes and they all eventually became deplorable. Tr. 242. For the first month or so after the family moved, the new home would be appropriate, but the conditions rapidly deteriorated and began to smell strongly of urine. Tr. 241-42. If the GAL came in the back door, the kitchen conditions were cluttered with the trash can overflowing, piles of dirty dishes in the sink, and empty liquor bottles laying around. Tr. 243. Throughout the Agency's involvement with the family, the conditions of the homes were an ongoing concern that was repeatedly addressed with Wright. Tr. 244. The homes were infested with cockroaches. Tr. 245. Wright was frequently uncooperative in allowing the GAL access to the home. Tr. 247. The last time Wright allowed the GAL into her home was May 19, 2011. Tr. 248. Other visits were attempted, but Wright would not permit them. Tr. 249. When Wright would allow the GAL into

the home, she would limit his access to certain rooms, specifically her bedroom which she kept padlocked shut. Tr. 253.

{¶43} The GAL was an active participant in the meetings with the school regarding K.C. Tr. 254. During the meetings, Wright was adversarial and would not admit that there was a problem. Tr. 254. This adversarial nature concerned the GAL and made him insist on her receiving a psychological evaluation. Tr. 259-60. Although Wright was cooperative in the beginning, she has become uncooperative with the GAL and the Agency over the last few years. Tr. 262-63. When it was suggested that K.C. be medicated for ADHD, Wright was resistant and was inconsistent in giving him his medication. Tr. 277-78.

{¶44} Karen Martin ("Martin") was the caseworker supervisor for the Agency. Tr. 328. Martin testified that generally family aide services are usually given to families for six to twelve months. Tr. 329. Martin was the one who agreed to give Wright extended services for three years. Tr. 329-30. The reason Martin gave for the extended services was that Wright was not cooperative and had failed to make progress. Tr. 330. According to Martin, the home conditions and the hygiene of the children remained poor and Wright failed to obtain employment, making it necessary for the family aide to continue her involvement. Tr. 330.

{¶45} Although Martin does not usually do home visits as part of her job, she did in this case to help facilitate communication with Wright on three separate occasions. Tr. 331. In November of 2010, Martin visited the home to discuss the contempt citation concerning the home conditions and K.C.'s medication. Tr. 332. The home was acceptable and Wright had filled the medication, but there were more pills in the bottle than there should have been. Tr. 332. This fact indicated that Wright was not giving K.C. his medication consistently. Tr. 333. Wright admitted to Martin that she did not always give K.C. his medication because she did not believe it worked. Tr. 333. Martin testified that although the Agency was sending a cab to pick Wright up and take her to her counseling sessions, Wright still was not attending. Tr. 334. Martin also addressed the need for Wright to take K.C. to the dentist on a consistent basis. Tr. 336.

{¶46} Martin's second home visit was on December 17, 2010, which was the day they removed the children from the home. Tr. 337. On that day, the home conditions were of significant concern. Tr. 337.

> **The toilet in the bathroom was, appeared to be clogged and was overwhelming with urine, feces, used toilet tissue. There were a large number of cockroaches present in the home. There was clutter, dirty dishes, dirty bottles, dirty silverware all in the living room, a number of papers strewn about, overwhelming smell of urine. Carpet powder had been sprinkled in the boys' room to, I believe, try and alleviate some of the odor. There were no sheets on the bed. Large number of cockroaches, including some crawling on myself and other people that were in the room.**

Tr. 337-38. At that time, K.C. appeared dirty, needed bathed, had matted hair, and dirty clothes. Tr. 340-41.

{¶47} The third and final home visit by Martin occurred on June 4, 2012. Tr. 342. The home conditions were better. Tr. 342. Wright indicated that it was easier to keep the home better without the kids living there. Tr. 342. However, there were still dirty dishes in the kitchen, spilled food in the refrigerator, live roaches on the refrigerator, dead roaches in the dog's food dish. Tr. 342.

{¶48} As part of her job, Martin was involved with the case reviews. Tr. 344. Martin testified that Wright would come to the meetings, but was uncooperative. Tr. 345. At the meetings, Wright would not answer direct questions and would not make eye contact with any Agency personnel. Tr. 345. When reviewing the case, Wright would frequently shake her head and roll her eyes. Tr. 345. During the last year, Wright would insist that her attorney repeat the Agency questions before she would answer them. Tr. 345. Wright would sometimes cooperate, but on other occasions would state that she does not want to be told what to do because she knows how to parent her children. Tr. 347.

{¶49} Martin testified that the Agency had made numerous attempts to assist Wright. Tr. 348.

> **[The Agency] provided food vouchers, vouchers to buy cleaning products, transportation to appointments, we've assisted her**

> **with the purchase of appliances for the home, payment of utilities, rent, et cetera. Quite a bit of assistance, I believe.**

Tr. 348-49. Martin also testified that she agreed with the decision to remove K.C. from the home in December of 2010. Tr. 349. The decision was made because Wright was still in contempt of court concerning the home conditions. Tr. 349. The home conditions were still unacceptable and K.C. was still not getting his medication. Tr. 349. Martin testified that the Agency had done everything it could to prevent the removal of K.C. from the home. Tr. 350.

> **In this particular case, I feel that the [Agency] had gone above and beyond standard level of reasonable efforts to attempt to maintain the children in the home with their mother.**

Tr. 350. Although the Agency took numerous steps and provided multiple services, they were unsuccessful. Tr. 351. After K.C. was removed from the home, Wright's level of compliance with the case plan did not improve. Tr. 352-53. Martin concluded after reviewing everything that in the three and a half years that the agency had been involved with Wright in this case, Wright has not substantially complied with the case plan and has not demonstrated the ability to safely parent K.C. in her home. Tr. 356.

{¶50} The next witness provided by the Agency was Michelle Miller ("Miller"), who was the caseworker for K.C.'s case since April of 2009. Tr. 382. That case was terminated by operation of law at the end of the two year period and the Agency immediately filed a new case to continue its involvement. Tr. 383.

The children were removed from Wright's home on December 17, 2010, and have not been returned to Wright's custody since then. Tr. 384. Since she began her involvement in 2009, the case plans have been similar in goals. Tr. 392. Whenever Miller would attempt to address her concerns with Wright, Wright would respond that she would try, but she was doing her best. Tr. 399. Although Wright would make improvements at various times, she did not maintain the improvements. Tr. 399. On multiple occasions, Wright would not allow her access to the house or the children. Tr. 401-02.

{¶51} As for parenting skills, Miller testified that Wright had completed a parenting class. Tr. 406. Miller testified that Wright's parenting improved for a while, but it was not sustained. Tr. 407. Miller had concerns about how Wright disciplined K.C. Tr. 407. On one occasion, Wright made K.C. sit at attention for a minimum of 30 minutes, but Miller did not know how long K.C. had been forced to sit like that prior to or after her visit. Tr. 407-08. In Miller's opinion, the length of time was inappropriate for a time out. Tr. 408. When Miller attempted to address the issue with Wright, Wright just would say that she did not parent in the same style as Miller. Tr. 408. Miller was concerned specifically about Wright's parenting of K.C. Wright did not follow through with the portion of the case plan requiring her to take K.C. to counseling even though the Agency provided the transportation. Tr. 410-11. In addition, Wright was convinced that K.C. belonged

in the Juvenile Detention Center and repeatedly wanted to place him there. Tr. 412.

{¶52} Wright was also required to have a source of income to provide for the basic needs of the family. Tr. 421. Miller testified that Wright had not obtained employment, but received some income from "doing hair", babysitting, and selling candy and cakes. Tr. 422. Most of Wright's bills are paid by her mother. Tr. 422.

{¶53} The case plan also required Wright to attend counseling. Tr. 423. For a period of time, Wright was attending. Tr. 424. The counseling stopped when Wright lost her medical coverage. Tr. 424. Miller testified that Wright lost her coverage because she refused to cooperate with Child Support Enforcement by providing information about the possible fathers of the children, so they suspended her medical privileges. Tr. 424-25. Once Wright returned to counseling, she was limited to ten sessions. Tr. 426. However, Miller testified that the Agency notified Wright that if she completed the ten sessions, the Agency would pay for additional sessions that were needed. Tr. 426. Wright did not complete the required ten sessions. Tr. 426. Wright, at the time of the final hearing, was in counseling and was attending her sessions regularly. Tr. 439. Wright was working on her anger management. Tr. 440. However, she was not consistently applying what she had learned. Tr. 440.

{¶54} Miller testified that the relationship between Wright and herself became adversarial. At one point, Wright refused to allow Miller in the home unless Wright's attorney was present. Tr. 430. The meetings were unproductive because Wright would only speak to her attorney and would have no direct communication with Miller. Tr. 431. Wright became completely uncooperative and refused to discuss the case plan with Miller or anyone else. Tr. 432.

{¶55} Due to issues with drug usage, Wright was ordered to comply with drug screens. Tr. 433. Miller requested that Wright have 19 drug screens. Tr. 434. Wright only complied and took 16 drug screens. Tr. 434. Of those, three tests were positive for marijuana. Tr. 435. The case plan was then amended to require a drug and alcohol assessment, which Wright completed. Tr. 437. Wright then completed the Drug and Alcohol Awareness Class. Tr. 437. However, the third positive test was after Wright completed the class. Tr. 438.

{¶56} Once K.C. was removed from the home, Wright was granted one visitation a week for two hours each time. Tr. 448. Miller testified that Wright missed her visits while in jail for contempt of court for failing to comply with the court ordered case plan. Tr. 448. Upon her release, Wright did not contact the Agency to arrange for visits for two or three weeks. Tr. 448. Afterwards, Wright rarely missed a visit. Tr. 448.

{¶57} Miller testified as to the services offered by the Agency as follows.

> **The [Agency] has offered [Wright] more services than I have ever offered any other client. We have tried multiple things. We've tried Respite, she refused to do Respite, trying to give her a break. I've tried to work with her for support systems to set up to try to give her a break. I've tried multiple things, multiple service providers, switched service providers for her. You know, nothing worked.**

Tr. 450. When Miller questioned Wright about possible permanent placements for the children, Wright refused to discuss the issue with Miller. Tr. 451. K.C. had been placed in his foster home for over a year. Tr. 452. In that time, K.C. had integrated into the home and has bonded with the family. Tr. 452. K.C.'s behaviors have dramatically improved. Tr. 453. That home has been identified as a potential adoptive home for K.C. Tr. 453. K.C. indicated to Miller that he did not wish to return to return to Wright's home. Tr. 455.

{¶58} In opposition to the case presented by the Agency, Wright presented the testimony of four witnesses, including herself. The first witness to testify was Barbara Walton ("Walton"), a community health worker who helped Wright after her pregnancy in 2010. Walton testified that she attempted to meet with Wright at least twice a month. Tr. 516. She testified that before coming to the home, she did not call and give advance notice. Tr. 516. Walton testified that during the visits, she did see some roaches, but did not see clutter. Tr. 519. She did not notice the smell of urine or feces in the home. Tr. 520. Wright was very cooperative with Walton and did not hesitate to show her the home. Tr. 521.

{¶59} Wright's second witness was Darlena Stewart ("Stewart"), a friend of the family. Stewart testified that Wright fed the children. Tr. 557. She also testified that Wright had issues with K.C. because of K.C.'s behavior. Tr. 556. Stewart admitted that at times, she could smell urine in Wright's home, but denied ever smelling feces. Tr. 558. Stewart also admitted to seeing roaches in the home. Tr. 565. Stewart testified that Wright sought medical attention for the children when it was needed. Tr. 564. In addition, Stewart testified that she went with Wright to a couple of visits. Tr. 568. Wright acted appropriately with the children. Tr. 569. The discipline Stewart observed Wright use was mainly yelling at the children. Tr. 570.

{¶60} Sandy Wright ("Sandy") is Wright's mother and testified on Wright's behalf. Sandy testified that Wright always kept her home clean. Tr. 608. She also testified that she never saw any cockroaches or noticed any smell of urine in the home. Tr. 608-09. Sandy indicated that her daughter disciplines the children by putting them in time out for approximately five minutes. Tr. 620-21.

{¶61} Wright herself testified on her behalf. Wright testified that when the Agency suggested counseling for K.C., she agreed that he needed it. Tr. 652. She testified that the family aide bought her cleaning supplies but did not actually do anything. Tr. 654. Wright claimed that she tried to follow the suggestions of the family aide. Tr. 654. The relationship between Wright and the Agency soured

when Miller became her caseworker. Tr. 655. Wright felt like Miller wanted her to do everything Miller's way and would not let her make any parenting decisions for herself. Tr. 655. Wright was concerned because she believed that some of Miller's instructions contradicted what she had been taught in parenting class. Tr. 656. Miller also was not helping her with dealing with K.C.'s behavioral issues at the school and at home, specifically his hitting people and stealing. Tr. 657-58. Wright also denied that she had ever withheld food from K.C. Tr. 658.

{¶62} Concerning the issues with K.C. at school, Wright testified that the school was upset because K.C. would hit the other children and his teachers. Tr. 658. She testified that the principal told her she needed to either spank K.C. or put him in time out. Tr. 662. She admitted that there were times she got upset during a school meeting, so would walk out of the meeting to handle her anger. Tr. 662.

{¶63} When questioned about the home, Wright testified that the family aide did give her suggestions for cleaning, which she took. Tr. 664. Wright claimed that most of the time, her house was clean. Tr. 664. She admitted that when Miller became her caseworker, she developed "an attitude" when Miller would try to instruct her on what to do. Tr. 666. Rather than getting too angry, Wright would instead ask Miller to leave. Tr. 666. Wright testified that when she met her current counselor, things improved and she learned how to control her temper. Tr. 667-68. Throughout her testimony, Wright indicated that all of the

issues were the result of her poor relationship with the Agency personnel and that she had worked on that issue and could now work with them better. Tr. 767.

**{¶64}** At the conclusion of the hearing, the trial court was unable to conclude the case due to some transcripts which had been stipulated to by the parties that had yet to be filed.[5] As a result, the trial court delayed the closing arguments until a later date. Closing arguments were scheduled for October 11, 2012. However, on October 12, 2012, the parties all waived closing arguments and the case was submitted to the trial court. The trial court entered its judgment entry terminating Wright's parental rights to K.C. on October 19, 2012. Wright appeals from this judgment and raises the following assignments of error.

### First Assignment of Error

**The awarding of permanent custody by the trial court below was not based upon clear and convincing evidence and therefore improper.**

### Second Assignment of Error

**The reliance of the trial court upon corporal punishment of a child by a parent that took place prior to the filing of a complaint and was, in fact, the basis of a prior complaint for abuse that was terminated and the children returned to the mother is misplaced and violates the rights of a parent to reasonable physical discipline of a child.**

---

[5] The transcripts were subsequently filed and considered by the trial court in reaching its judgment.

**Third Assignment of Error**

**The State of Ohio through [the Agency] failed to make reasonable efforts to provide services to the family here and to avoid the permanent removal of the children from the home.**

{¶65} In the first assignment of error, Wright alleges that the findings of the trial court were not supported by clear and convincing evidence. The right to raise one's own child is a basic and essential civil right. *In re Murray,* 52 Ohio St.3d 155, (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include in pertinent part as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or**

**more months of a consecutive twenty-two month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(2)   With respect to a motion made pursuant to [R.C. 2151.413(D)(1)], the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

**(C)  In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \* \***

**(D)(1)  In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)** The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

**(c)** The custodial history of the child, including whether the child has been in the temporary custody of one or more public services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

**(d)** The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

**(e)** Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**\* \* \***

**(E)** In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

**(1)** Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for

**the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(4)   The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

R.C. 2151.414.

{¶66} At the time the Agency filed the motion for permanent custody, K.C. had not been in the temporary custody of the Agency for more than one year. Thus, the trial court was required to determine whether there were sufficient factors under R.C. 2151.414(E) to support the conclusion by clear and convincing evidence that K.C. could not and should not be placed with Wright within a reasonable period of time.  The trial court determined that Wright had not shown that she could keep the house clean for a sustained period of time.   This occurred despite the fact that the agency had been working with her for many years and had made many attempts to help her.  There was a great deal of testimony by multiple witnesses that although Wright would start out with a clean house, within a month, it would be back to substandard conditions with roaches, clutter, and an overwhelming stench of urine coming from it.   While Wright had custody of K.C., he frequently went to school dirty and smelling of urine and feces.  The Agency worked with Wright for several years before removing K.C. and

continued to work with her afterward. Thus, there was clear and convincing evidence as to the first factor under R.C. 2151.414(E)(1).

{¶67} In addition, there was substantial evidence that Wright lacked commitment to provide an adequate home for K.C. Wright frequently would not work with the Agency workers or with the school employees to try and help K.C. When the workers would offer assistance, she would decline it. When the caseworkers wanted to view the home, she refused. Even when Wright allowed the workers into the home, she refused to give them access to all the rooms. At times, she even refused the workers access to the children. She also admitted that she did not always give K.C. his medicine for ADHD because she did not believe it helped. When it came to counseling, Wright would decide to discontinue her therapy if she believed the therapist was reporting to the Agency. Over the multiple years she worked on her case plan, she did not make much progress and most of the progress she did make disappeared over time. Given this evidence, the trial court could conclude by clear and convincing evidence that Wright lacked the commitment to providing an adequate home as set forth in R.C. 2151.414(E)(4).

{¶68} Having found factors under R.C. 2151.414(E) present, the trial court was required to enter a finding that K.C. cannot be placed with Wright within a reasonable time. The trial court then had to consider the factors under R.C.

2151.414(D) to determine if the termination of parental rights was in the best interest of K.C. The trial court specifically stated that it had considered the factors. A review of the record shows that the foster parents were continuing to allow K.C. to have a relationship with his siblings and that K.C. had adjusted well to being a part of the foster family. R.C. 2151.414(D)(1)(a). K.C., through the GAL and through the testimony of the caseworker, indicated that he did not want to return to his mother. R.C. 2151.414(D)(1)(b). The trial court also considered the length of time K.C. was in the temporary custody of the Agency and his need for a permanent placement. R.C. 2151.414(D)(1)(c, d). In addition, the foster mother has expressed interest in adopting K.C., which would help to grant a permanency that K.C. needed and wanted. That was the outcome that K.C. wanted.

{¶69} Upon a review of the lengthy record, there was more than sufficient evidence to support the trial court's conclusions by clear and convincing evidence that K.C. could not be returned to Wright within a reasonable period of time. There was also more than sufficient evidence to support the trial court's conclusions by clear and convincing evidence that the termination of Wright's parental rights was in the best interest of K.C. Thus, the trial court did not err in terminating the parental rights of Wright and the first assignment of error is overruled.

{¶70} Wright claims in the second assignment of error that the trial court erred by relying upon the prior claim for excessive physical discipline. A review of the record shows that there is no basis for this assignment of error. Although the trial court mentioned the prior claim while discussing the history of the case, it was not one of the reasons cited by the trial court for the termination of parental rights. The trial court cited to the deplorable home conditions as well as the children's personal hygiene, Wright's resistance to working with the school, her resistance to counseling, her refusal to cooperate with the Agency workers, and her refusal to work with the GAL. Oct. 19, 2012, J.E., 5-7. The trial court also pointed to how K.C.'s behavioral issues and hygiene have improved since he has been out of the home. *Id.* at 8. The trial court pointed to the long history this family has with the Agency and how Wright has made little sustained progress over the many years the Agency has worked with her. *Id*. at 7-8. Specifically, the trial court noted that the psychological evaluation showed that Wright had a low IQ and a poor prognosis for changing her behavior due to her paranoid thinking. *Id*. at 8-9. At no point did the trial court rely upon Wright's conviction for physically abusing K.C. during the earlier case. Thus, the trial court did not err. The second assignment of error is overruled.

{¶71} Finally, Wright argues that the trial court erred by finding that the Agency had made reasonable efforts to provide services to the family to avoid the

removal of the children. The evidence does not support Wright's claim. The record indicates that the Agency did everything it could to assist Wright. The Agency allowed Wright to continue to try and reach the same goals set forth in the case plan since 2009. During that time, Wright was provided with a family aid to try and help her learn to be a better parent, to learn to clean the house, and to assist with finding employment. The family aid went above and beyond the expectations by volunteering to help Wright clean her house and by coming to the home every morning to help insure that K.C. was clean and wearing clean clothes before he left for school each day. The Agency helped Wright by providing cleaning supplies, furniture, and appliances so that Wright could provide an adequate home for K.C. The Agency also provided transportation so that Wright and K.C. could each attend their counseling sessions. Finally, the Agency worked with Wright and the schools to address K.C.'s behavioral issues. The problem was not with what the Agency offered, it was Wright's refusal to make use of what was offered. Based upon the testimony before it, the trial court could very reasonably conclude by clear and convincing evidence that the Agency did everything it could to prevent the removal of K.C. from the home and to attempt to return K.C. to the home. The third assignment of error is overruled.

{¶72} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, the judgment of the Court of Common Pleas of Allen County, Juvenile Division is affirmed.

*Judgment Affirmed*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**